## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| MALCOLM ELDRIDGE HALL,<br>　　　Petitioner,<br><br>v.<br><br>MICHAEL NESSINGER, Warden of<br>Donald W. Wyatt Detention Facility;<br>PATRICIA HYDE, Director ICE<br>Boston Field Office; TODD M. LYONS,<br>Acting Director of ICE; KRISTI<br>NOEM, United States Secretary of<br>Homeland Security, *in their official<br>capacities.*<br>　　　Respondents. | C.A. No. 25-cv-667-JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Malcolm Eldridge Hall, who is currently being held in the custody of Immigration and Customs Enforcement ("ICE"), brings this habeas petition under 28 U.S.C. § 2241. ECF No. 1. Mr. Hall contends that the Government violated the Due Process Clause of the Fifth Amendment to the United States Constitution, the Administrative Procedure Act ("APA"), and the Immigration and Nationality Act ("INA") when it revoked his order of supervision and re-detained him. *Id.* at 9-11. He now seeks relief in this Court, requesting an order that he be immediately released from ICE custody. *Id.* at 11. The Government objects to Mr. Hall's petition and argues that it should be dismissed. ECF No. 8.

For the reasons set forth below, the Court GRANTS Mr. Hall's petition and ORDERS his immediate release.

## I.   BACKGROUND

### A.   Statutory and Regulatory Framework

Section 1231(a) of the INA authorizes the Department of Homeland Security ("DHS") to detain noncitizens who have been "ordered removed." *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 575 (2022) (quoting 8 U.S.C. § 1231(a)). "After the entry of a final order of removal against a noncitizen, the Government generally must secure the noncitizen's removal during a 90-day 'removal period.'"[1] *Id.* (quoting 8 U.S.C. § 1231(a)(1)(A)). "During the removal period, detention is mandatory." *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1231(a)(2)).

If the noncitizen is not deported within the 90-day removal period, then they are only subject to discretionary detention, meaning they "'may be detained'[2] or may be released under terms of supervision." *Arteaga-Martinez*, 596 U.S. at 575 (2022) (quoting 8 U.S.C. § 1231(a)(6)). Unlike other provisions of the INA, Section 1231(a) does not require the Government to provide a noncitizen with a bond hearing before

---

[1] The "removal period" begins on the latest of three dates: "(1) the date the order of removal becomes 'administratively final,' (2) the date of the final order of any court that entered a stay of removal, or (3) the date on which the [noncitizen] is released from non-immigration detention or confinement." *Guzman Chavez*, 594 U.S. at 528 (quoting 8 U.S.C. § 1231(a)(1)(B)).

[2] After the 90-day removal period, the Government "may" detain only four categories of noncitizens: "(1) those who are 'inadmissible' on certain specified grounds; (2) those who are 'removable' on certain specified grounds; (3) those it determines 'to be a risk to the community'; and (4) those it determines to be 'unlikely to comply with the order of removal.'" *Arteaga-Martinez*, 596 U.S. at 578-79 (quoting 8 U.S.C. § 1231(a)(6)).

an IJ where the Government bears the burden of justifying the noncitizen's continued detention. *Id.* at 581 (distinguishing between Section 1226(a), which provides for bond hearings at the outset of detention, and Section 1231(a)(6), which does not); *see also Hernandez-Lara v. Lyons*, 10 F.4th 19, 39 (1st Cir. 2021) (discussing the Government's burden of proof in Section 1226(a) cases). Instead, ICE officials themselves are responsible for making decisions regarding continued detention and supervised release. Two regulations primarily govern their decision-making: 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13. *See Rombot v. Souza*, 296 F. Supp. 3d 383, 387 (D. Mass. 2017); *Santamaria Orellana v. Baker*, No. 25-1788-TDC, 2025 WL 2444087, at *4 (D. Md. Aug. 25, 2025). The regulations differ in a few slight but important respects.

### 1. The Post-Removal-Period Procedures: Detention and Supervised Release Under 8 C.F.R. § 241.4

8 C.F.R. § 241.4 specifically applies to noncitizens who are detained beyond the 90-day removal period (also known as the "post-removal-period"). *Guzman Chavez*, 594 U.S. at 529 (citing 8 C.F.R. § 241.4). Under this provision, if ICE wishes to continue detaining a noncitizen beyond the post-removal-period, then ICE must conduct an individualized "custody review." *Cruz v. Bondi*, No. 25-cv-262-JJM-PAS, 2025 WL 3295485, at *2 (D.R.I. Nov. 26, 2025) (citing 8 C.F.R. § 241.4). ICE must follow several key procedures, such as: (1) conducting the initial custody review "prior to the expiration of the removal period" or "as soon as possible thereafter," *id.* (citing 8 C.F.R. §§ 241.4(h)(1), (k)(1)(i), (k)(2)(iv)); (2) "provid[ing] written notice to the detainee about 30 days in advance of the pending records review" so that they may

submit information in support of their release, *id.* (citing 8 C.F.R. § 241.4(h)(2)); and (3) "forward[ing] by regular mail a copy of any notice or decision that is being served" on the noncitizen to the noncitizen's attorney, if they are represented, *id.* (citing 8 C.F.R. § 241.4(d)(3)).

To be released on an order of supervision ("OSUP"), "the noncitizen must show that: their immediate removal is not practical or proper; they are not likely to be violent or 'pose a threat to the community following release'; and they do not 'pose a significant risk of flight' or of 'violat[ing] the conditions of release.'" *Id.* (quoting 8 C.F.R. § 241.4(e)). ICE must also consider whether the noncitizen is "'a significant flight risk or may abscond to avoid removal,' 'favorable factors, including ties to the United States such as the number of close relatives residing here lawfully,' and factors bearing on the [noncitizen's] dangerousness, such as criminal history, disciplinary infractions, and past immigration violations, among others." *Id.* (quoting 8 C.F.R. § 241.4(f)). Finally, ICE must issue a written decision, briefly explaining its reasoning behind continuing detention or ordering supervised release. *Id.* (citing 8 C.F.R. § 241.4(d)).

ICE may, in its discretion, revoke supervised release under certain circumstances. *Rombot*, 296 F. Supp. 3d at 387. For instance, supervised release may be revoked, and the noncitizen may be re-detained, if: (1) "[t]he purposes of release have been served"; (2) "[t]he [noncitizen] violates any condition of release; (3) [i]t is appropriate to enforce a removal order or to commence removal proceedings against [the noncitizen]"; or (4) "[t]he conduct of the [noncitizen], or any other

circumstance, indicates that release would no longer be appropriate." *Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224, 225 (D. Mass. 2025) (quoting 8 C.F.R § 241.4(*l*)(2)).[3]

However, in revoking supervised release, ICE must follow another set of procedures. *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 652 (D. Mass. 2018). First, ICE must notify the noncitizen of the reasons for revocation and their return to ICE custody. *Id.* (citing 8 C.F.R § 241.4(*l*)(1). Second, ICE must afford the noncitizen "an initial informal interview promptly" after their return to ICE custody and afford them "an opportunity to respond to the reasons for revocation stated in the notification." *Id.* (citing 8 C.F.R § 241.4(*l*)(1). Third, the revocation decision must be made either by the Executive Associate Director of ICE,[4] a district director of ICE, or any other official "delegated the function or authority … for a particular geographic district, region, or area." *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 160-61 (W.D.N.Y. 2025) (citing 8 C.F.R. §§ 1.2, 241.4 (*l*)(2)); *see also Santamaria Orellana*, 2025 WL 2444087, at *4.

### 2.    The *Zadvydas* Procedures: Detention and Supervised Release Under 8 C.F.R. § 241.13

ICE promulgated 8 C.F.R. § 241.13 following the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001). In *Zadvydas*, the Court identified "a serious

---

[3] As other courts have done, to avoid confusion between the letter "l" and the number "1," the Court has italicized "*l*" throughout the opinion when referring to this particular provision of 8 C.F.R § 241.4. *See, e.g.*, *Perez-Escobar*, 792 F. Supp. 3d at 225; *Zhu v. Genalo*, No. 1:25-cv-06523 (JLR), --- F. Supp. 3d ----, 2025 WL 2452352, at *4 n.1 (S.D.N.Y. Aug. 26, 2025); *Santamaria Orellana*, 2025 WL 2444087, at *4.

[4] Although the regulation specifically refers to this person as the "Executive Associate Commissioner," that provision now refers to the "Executive Associate Director of ICE." *Ceesay*, 781 F. Supp. 3d at 160 (citing 8 C.F.R. § 1.2).

constitutional problem" raised by Section 1231(a)(6).  533 U.S. at 690.  The statute permitted immigration officials to detain certain noncitizens beyond the 90-day removal period, but it did not expressly provide an end date for the period of detention.  *Id.* at 688-89.  The Government therefore argued that it was authorized to detain certain noncitizens *indefinitely.*  *Id.* at 689-90.

The Supreme Court rejected this argument and made clear that detention under Section 1231(a) is authorized only so long as it is "reasonably necessary to secure [the noncitizen's] removal."  *Id.* at 699.  The Court held that such detention is "presumptively reasonable" for up to six months.  *Id.* at 701.  After the six months are up, if the noncitizen "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the Government must either rebut that showing or release the noncitizen.  *Guzman Chavez*, 594 U.S. at 529 (quoting *Zadvydas*, 553 U.S. at 699-700).  ICE codified these regulations at 8 C.F.R. § 241.13, which are referred to as "the *Zadvydas* procedures."  *Id.*; *see also Fajardo v. Decker*, No. 22-CV-3014 (PAE), 2022 WL 17414471, at *6 (S.D.N.Y. Dec. 5, 2022).

Consistent with its purpose, 8 C.F.R. § 241.13 establishes "special review procedures" for a noncitizen detained under Section 1231(a) after the removal period lapses and who "has provided good reason to believe there is no significant likelihood of removal … in the reasonably foreseeable future."  8 C.F.R. § 241.13(a).  The procedures begin once the noncitizen "submits a written request providing reasons why there is no significant likelihood the Government will remove him or her."  *E.M.M. v. Almodovar*, No. 25-CV-08212 (MMG), 2025 WL 3077995, at *3 (S.D.N.Y.

Nov. 4, 2025) (citing 8 C.F.R. § 241.13(d)(1)).  "The written request triggers a formal review by the Headquarters Post-Order Detention Unit ('HQPDU')."  *Id.* (citing 8 C.F.R. §§ 241.13(e), (f)).  "Once the review concludes, the HQPDU issues a 'written decision' regarding 'whether there is a significant likelihood that the [noncitizen] will be removed in the reasonably foreseeable future under the circumstances.'"  *Id.* (quoting 8 C.F.R. § 241.13(g)).  "If that likelihood is low or not significant," then the noncitizen is released subject to an OSUP.  *Id.* (citing 8 C.F.R. § 241.13(h))

Like 8 C.F.R § 241.4, supervised release under the *Zadvydas* procedures may be revoked by ICE.  *See* 8 C.F.R. §§ 241.13(i)(1), (2).  Where the two procedures differ, however, is that 8 C.F.R. § 241.13(i) permits ICE to re-detain a noncitizen *after* they have been "issued a final order of removal, detained, and subsequently released on an OSUP."  *Nguyen v. Hyde*, 788 F. Supp. 3d 144, 149 (D. Mass. 2025).  In this specific context, the process for re-detaining a noncitizen requires, under First Circuit precedent: "(1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeable future."  *Kong v. United States*, 62 F.4th 608, 619-20 (1st Cir. 2023) (citing 8 C.F.R. § 241.13(i)(2)).[5]

Revoking supervised release in this context also requires to ICE to: (1) notify the noncitizen "of the reasons for revocation"; (2) "conduct an initial informal interview promptly after … return to [ICE] custody to afford the [noncitizen] an

---

[5] Supervised release may also be revoked under 8 C.F.R. § 241.13 "upon a violation of conditions of release."  *Santamaria Orellana*, 2025 WL 2444087, at *4 (quoting 8 C.F.R. § 241.13(i)(1)).

opportunity to respond to the reasons for revocation stated in the notification"; and (3) permit the noncitizen to "submit any evidence or information" to show that there is no "significant likelihood" of removal in the reasonably foreseeable future," or that the noncitizen "has not violated the order of supervision." *Santamaria Orellana*, 2025 WL 2444087, at *4 (quoting 8 C.F.R. § 241.13(i)(3)).

### 3.    Constitutional Protections

The procedures set forth in both 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13 are intended to provide noncitizens with fundamental due process protections that courts have found to be constitutionally required. *Jimenez*, 317 F. Supp. 3d at 655 (citing Detention of Aliens Ordered Removed, 65 F.R. 80281–01, at 80283 (2000)); *see also Santamaria Orellana*, 2025 WL 2444087, at *5-6; *D'Alessandro v. Mukasey*, 628 F. Supp. 2d 368, 388-403 (W.D.N.Y. 2009). This is a principle that Justice Sotomayor recently reaffirmed in a pivotal immigration case. *See Noem v. Abrego Garcia*, 604 U.S. ----, 145 S. Ct. 1017, 1019 (2025) (statement of Sotomayor, J.) (recognizing that the Government was required to provide the petitioner, Mr. Kilmar Abrego Garcia, "with all the process to which he would have been entitled had he not been unlawfully removed to El Salvador," including the procedures set forth in 8 C.F.R. § 241.4(*l*)).

Therefore, ICE violates a noncitizen's due process rights when the agency re-detains them and fails to comply with these revocation procedures. *Jimenez*, 317 F. Supp. 3d at 656-57; *Rombot*, 296 F. Supp. 3d at 388; *Santamaria Orellana*, 2025 WL 2444087, at *6.

## B.    Factual and Procedural History

Mr. Hall came to the United States at age sixteen on September 28, 1996.  ECF No. 1 at 3.  He and his family fled Liberia, which was amid a civil war.  ECF No. 1-2 at 1.  His mother was granted asylum in the United States, and Mr. Hall was admitted into the country on a B-2 visa.  ECF No. 1 at 3; ECF No. 8-1 at 2.  Due to the persecution, he was likely to face in his home country, United States Citizen and Immigration Services ("USCIS") granted Mr. Hall asylum on May 18, 2000.  ECF No. 1-2 at 1; ECF No. 8-1 at 2.  He has resided in Rhode Island ever since.  ECF No. 1-2 at 1.

On February 26, 2007, Mr. Hall was convicted of various drug offenses under R.I. Gen. Laws § 21-28-4.01.[6]  ECF No. 1 at 3.  He was sentenced to five years in prison and ten years of parole.  *Id.*

On August 18, 2010, ICE encountered Mr. Hall while he was in prison and placed him in removal proceedings before the Boston Immigration Court.  *Id.*; ECF No. 8-1 at 3.  ICE charged him with being removable under 8 U.S.C. § 1227(a)(2)(A)(iii).[7]  ECF No. 8-1 at 3.  On January 20, 2011, an IJ ordered Mr. Hall removed to Liberia.  *Id.*  Though he initially filed an appeal with the Board of

---

[6] In his petition, Mr. Hall incorrectly states that he was convicted under R.I. Gen. Laws § 21-48-4.01, but there is no such statutory provision.

[7] Under this provision of the INA, noncitizens who are convicted of an "aggravated felony" after admission into the United States are removable.  *Whyte v. Lynch*, 807 F.3d 463, 466 (1st Cir. 2015) (quoting 8 U.S.C. § 1227(a)(2)(A)(iii)).  An "aggravated felony" is defined as, among other things, "a crime of violence … for which the term of imprisonment [is] at least one year."  *Id.* (quoting 8 U.S.C. § 1101(a)(43)(F)).

Immigration Appeals ("BIA"), Mr. Hall later withdrew that appeal, which rendered his order of removal final.  *Id.*

Upon his release from prison, Mr. Hall was turned over to ICE custody.  ECF No. 1 at 3.  He remained in ICE detention for about ten months.  *Id.*  While he was in custody, ICE attempted to secure a travel document for Mr. Hall's removal to Liberia.  *Id.* at 2-3.  However, the agency was unsuccessful in its efforts, later notifying Mr. Hall in July 2011 that the Liberian "Consulate stated on 7/14/11 they are unlikely to issue us your ID."  *Id.* at 3; *see also* Ex. A, ECF No. 1-3 at 1.  As such, ICE issued Mr. Hall an OSUP and ordered him released on or about November 26, 2011.  ECF No. 1 at 2-3; ECF No. 8-1 at 3.

As part of his supervised release, ICE required Mr. Hall to attend biannual and then annual check-ins at its Enforcement and Removal ("ERO") office in Warwick, Rhode Island.  ECF No. 1 at 2-3; ECF No. 1-2 at 1.  Mr. Hall regularly attended these check-ins for about thirteen years.  ECF No. 1 at 2-3.  During that period, Mr. Hall completed his parole for his earlier criminal conviction, and he has not been charged with any criminal offenses since being released from ICE custody.  ECF No. 1-2 at 1.

On October 7, 2025, almost 14 years after being released, when Mr. Hall appeared at the ERO office for his annual check-in, ICE officials told him that it had revoked his supervised release.  ECF No. 1 at 4.  ICE cited "changed circumstances" as the basis for its revocation and stated that the "case is currently under review by Liberia for the issuance of a travel document."  *Id.*; ECF No. 1-4 at 1.

ICE officials subsequently re-detained Mr. Hall under 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13. ECF No. 1-4 at 1. They transferred him to the Donald W. Wyatt Detention Facility in Central Falls, Rhode Island, where he remains today. ECF No. 1 at 4.

On November 21, 2025, Mr. Hall attended a virtual interview with two ICE officers and a representative from the Liberian Embassy. *Id.* The representative asked Mr. Hall if he could produce certain identity documents, including a birth certificate. ECF No. 1-2 at 2. Mr. Hall answered that he could not because he had never had those documents in his possession, nor had he ever seen his birth certificate. *Id.*

The representative then asked the ICE officials if they had any identity documents for Mr. Hall, or if they could produce any travel documents for him. *Id.* The ICE officials said they had neither. *Id.* The representative told the ICE officials that they would have to provide this documentation, and the meeting was rescheduled for a later date. *Id.*

On December 12, 2025, Mr. Hall filed the instant petition, seeking release from ICE custody. ECF No. 1. He argues that the revocation of his supervised release and subsequent re-detention violate the Fifth Amendment of the U.S. Constitution, the APA, and the INA. *Id.* at 11.

The Government objects, arguing that the Court should dismiss Mr. Hall's petition because his detention is "presumptively reasonable" under *Zadvydas* and because his removal to Liberia "is significantly likely to occur in the reasonably

foreseeable future." ECF No. 8 at 2-4. Additionally, Keith M. Chan, ICE's Assistant Field Office Director, asserts in a declaration that the Liberian Embassy issued a travel document for Mr. Hall on or around December 3, 2025. ECF No. 8-1 at 4.

Since filing his petition, ICE officials conducted a custody review of Mr. Hall's detention on December 26, 2025. *Id.* at 4.; ECF No. 1 at 4. ICE has yet to release a decision regarding this custody review.

## II.    DISCUSSION

### A.    Does *Zadvydas* Apply?

The Government first argues that Mr. Hall's petition is "premature" because his "current detention is well within the six-month period deemed presumptively reasonably by *Zadvydas*." ECF No. 8 at 2. As of its filing, the Government asserts that Mr. Hall has been in custody for only 76 days, and it is "presumptively reasonable" for the Government to continue to detain him. *Id.* at 3.

This position is not well taken. Mr. Hall has been detained by ICE for more than six months. Following his release from prison, Mr. Hall was detained by ICE for about ten months from January 2011 to November 2011. ECF No. 1 at 3; ECF No. 1-2 at 1. Then, Mr. Hall was re-detained by ICE in October 2025. ECF No. 1 at 4; ECF No. 1-2 at 2. In total, he has been in ICE custody for more than twelve months and counting, meaning that his detention is *not* "presumptively reasonable" under *Zadvydas*. 533 U.S. at 701.

Though it does not say so explicitly, the Government seems to suggest that the presumptively reasonable six-month clock restarted for Mr. Hall once he was re-

12

detained by ICE.  ECF No. 8 at 2 ("Petitioner's *current* detention is well within the six-month period deemed presumptively reasonable by *Zadvydas*....") (emphasis added).  But this position "has no basis in either the statutes, the regulations, or *Zadvydas* itself."  *Villanueva v. Tate*, No. H-25-3364, --- F.Supp.3d ----, 2025 WL 2774610, at *9 (S.D. Tex. Sept. 26, 2025).  Indeed, most courts to consider this issue have concluded that the *Zadvydas* period is cumulative.  *See, e.g.*, *Siguenza v. Moniz*, No. 25-cv-11914-ADB, 2025 WL 2734704, at *3 (D. Mass. Sept. 25, 2025) (collecting cases).  To rule otherwise would mean that the Government could simply hold noncitizens indefinitely by continuously releasing and then re-detaining them—a type of "gamesmanship" that runs afoul of *Zadvydas*.  533 U.S. at 690 (recognizing that the "indefinite detention" of a noncitizen "would raise a serious constitutional problem"); *see also Villanueva*, 2025 WL 2774610, at *9; *Siguenza*, 2025 WL 2734704, at *3.

The Government's argument is unpersuasive for another reason: *Zadvydas* no longer applies to Mr. Hall's particular circumstances.  *Zadvydas* involved "ICE's authority to detain *in the first place* upon an issuance of a final order of removal." *Nguyen*, 788 F. Supp. 3d at 149 (emphasis added); *see also Escalante v. Noem*, No. 9:25-cv-00182-MJT, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025) ("*Zadvydas*, relied upon by Respondents, dealt with the *initial* detainment of [a noncitizen] awaiting removal." (emphasis added)).  Critically, the petitioners in *Zadvydas* were never granted supervised release following a final order of removal. *Yan-Ling X. v. Lyons*, No. 1:25-cv-01412-KES-CDB (HC), 2025 WL 3123793, at *3 (E.D. Cal. Nov. 7,

2025) (citing *Zadvydas*, 533 U.S. at 701). Thus, in that specific context, the Supreme Court held that once a noncitizen has been detained for six months and "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701.

Now that Mr. Hall has been re-detained, the Government seems to suggest that he bears the initial burden under *Zadvydas* of proving that there is no significant likelihood of his removal in the reasonably foreseeable future. ECF No. 8 at 4. The Government even goes as far as to argue that "[a]t this juncture, the government is not obligated to produce evidence to rebut [Mr. Hall's] speculation that his removal is unlikely." *Id.* at 3-4. But the Government misunderstands its evidentiary burden.

"[T]his is not your typical first round detainment of [a noncitizen] awaiting removal." *Escalante*, 2025 WL 2206113, at *3. ICE *already* detained Mr. Hall back in 2011—beyond the 90-day removal period and the presumptively reasonable six-month period—and then subsequently released him on supervised release for thirteen years. ECF No. 1 at 3. ICE's own regulations provide that supervised release may be revoked if, "on account of changed circumstances [ICE] determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). The regulations also state that, "if [ICE] determines, because of a change of circumstances, that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future to the country to which the [noncitizen] was ordered removed or to

a third country, the [noncitizen] shall again be subject to the custody review procedures under [8 C.F.R. § 241.4]."  8 C.F.R. § 241.4(b)(4).

These regulations clearly indicate that, upon revocation of supervised release, it is *the Government's* burden to show a significant likelihood that the noncitizen may be removed.  *See, e.g.*, *Escalante*, 2025 WL 2206113, at *3; *Yan-Ling X.*, 2025 WL 3123793, at *3; *Roble v. Bondi*, No. 25-cv-3196 (LMP/LIB), 2025 WL 2443453, at *4 (D. Minn. Aug. 25, 2025); *Abuelhawa v. Noem*, No. 4:25-cv-04128, 2025 WL 2937692, at *8 (S.D. Tex. Oct. 16, 2025).  "Imposing the burden of proof on the [noncitizen] each time he is re-detained would lead to an unjust result and serious due process implications."  *Escalante*, 2025 WL 2206113, at *3.  Therefore, because this case involves ICE's authority to *re-detain* Mr. Hall after the agency revoked his supervised release, the Court must determine whether the Government has shown that, on account of changed circumstances, there is a significant likelihood of Mr. Hall's removal in the reasonably foreseeable future.  *Nguyen*, 788 F. Supp. 3d at 149 (citing 8 C.F.R. § 241.13(i)(2)).

### B.    The Application of 8 C.F.R. § 241.13(i)(2)

First Circuit precedent recognizes that "ICE's decision to re-detain a noncitizen like [Mr. Hall] who has been granted supervised release is governed by ICE's own regulation requiring (1) an individualized determination (2) by ICE that, (3) based on changed circumstances, (4) removal has become significantly likely in the reasonably foreseeably future."  *Kong*, 62 F.4th at 619-20 (citing 8 C.F.R. § 241.13(i)(2)).  "The plain language of the regulation, however, does not allow a court in the first instance

to make the required individualized finding." *Id.* at 620. "To the extent ICE claims that it made such a determination, the court should review that claim in light of the regulations instructing ICE on how it should make such a determination." *Id.* (citing 8 C.F.R. §§ 241.13(f), (i)(2)).

On October 7, 2025, ICE notified Mr. Hall of its intent to revoke his supervised release and re-detain him. ECF No. 1-4 at 1. ICE's notice simply stated that such a decision was made "based on a review of [Mr. Hall's] official alien file and a determination that there are changed circumstances in [his] case." *Id.* The notice further provided that "ICE has determined that [Mr. Hall] can be removed from the United States pursuant to the outstanding order of removal against him…. [Mr. Hall's] case is currently under review by Liberia for the issuance of a travel document." *Id.*

These generic and conclusory statements are insufficient bases for revoking Mr. Hall's supervised release. Indeed, dozens of federal courts across the country have analyzed identically worded notifications by ICE and have found them to be deficient. *See, e.g.*, *Nguyen*, 788 F. Supp. 3d at 150, 152 (finding notice of revocation of supervised release insufficient where it stated that the detention decision was "made based on a review of [the noncitizen's] official alien file and a determination that there are changed circumstances in [his] case" and that his "case is under current review" by his native country "for the issuance of a travel document"); *Perez-Escobar*, 792 F. Supp. 3d at 225-26 (same); *M.S.L. v. Bostock*, No. 6:25-cv-01204-AA, 2025 WL 2430267, at *10 (D. Or. Aug. 21, 2025); *Sarail A. v. Bondi*, No. 25-cv-2144 (ECT/JFD),

--- F. Supp. 3d ----, 2025 WL 2533673, at *2, 10 (D. Minn. Sept. 3, 2025) (same); *Rokhfirooz v. Larose*, No.: 25-cv-2053-RSH-VET, --- F.Supp.3d ----, 2025 WL 2646165, at *1-3 (S.D. Cal. Sept. 15, 2025) (same); *Rasakhamdee v. Noem*, No.: 3:25-cv-02816-RBM-DEB, 2025 WL 3102037, at *4 (S.D. Cal. Nov. 6, 2025) (same).

As one court put it, "[s]imply to say that circumstances had changed or there was a significantly likelihood of removal in the foreseeable future is not enough." *Sarail A.*, 2025 WL 2533673, at *10. The noncitizen "must be told *what* circumstances had changed or *why* there was now a significant likelihood of removal in order to meaningfully respond to the reasons and submit evidence in opposition, as allowed under § 241.13(i)(3)." *Id.* (emphasis in original). ICE's failure to provide a noncitizen with adequate notice of its basis for revoking supervised release violates the noncitizen's due process rights. *See Perez-Escobar*, 792 F. Supp. 3d at 226; *see also Nguyen*, 788 F. Supp. 3d at 152-53.

Here, from the moment Mr. Hall was detained on October 7, 2025, ICE failed to provide him with sufficient notice regarding the revocation of his supervised release. ICE chose to re-detain Mr. Hall on account of "changed circumstances in [his] case," but did not tell him *what* circumstances had changed. *Cf. Sarail A.*, 2025 WL 2533673, at *10. At that time, Mr. Hall's case was simply "under review by Liberia for the issuance of a travel document," but Liberia had not actually issued any travel document when he was detained.

By November 21, 2025—a month and a half into Mr. Hall's re-detention—Liberia had still not issued a travel document. ECF No. 1 at 4. In fact, Mr. Hall

attended a virtual interview that day with a representative from the Liberian Embassy, and the meeting ended without Mr. Hall or ICE officers being able to produce the necessary identity documents to process Mr. Hall's removal to Liberia. *Id.*; *see also* ECF No. 1-2 at 2.

The Government, however, claims that the analysis has changed in recent weeks. Mr. Chan, ICE's Assistant Field Office Director, asserts in a declaration that "[o]n or around December 3, 2025, the Embassy of Liberia issued a travel document for [Mr. Hall]." ECF No. 8-1 at 4. The Government contends that Mr. Hall's removal is "significantly likely to occur in the reasonably foreseeable future," now that ICE is in possession of this travel document. ECF No. 8 at 4.

The Court feels the need to point out that this logic is concerning. According to the Government's own admission, the purported rationale for revoking Mr. Hall's supervised release did not materialize until December 3, 2025—nearly two months *after* Mr. Hall had been re-detained by ICE. This creates a perverse incentive: if ICE had its way, it could simply revoke a noncitizen's supervised release and provide a post hoc rationalization for doing so months after the fact.[8] All the while, the noncitizen—sitting in an ICE detention center—would be deprived of their fundamental interest in their liberty. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529

---

[8] Though the Court need not decide this case on APA grounds, it is important to note that, under arbitrary and capricious review in the administrative law context, "[t]he basic rule is clear: [a]n agency must defend its actions based on the reasons it gave *when it acted*," not on "impermissible post hoc rationalizations." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22, 24 (2020) (emphasis added).

(2004) (recognizing "the most elemental of liberty interests—the interest in being free from physical detention by [the] government").

There is also another problem regarding the purported evidence in the record. As mentioned earlier, the burden is on *the Government* to show that, on account of changed circumstances, there is a significant likelihood of the noncitizen's removal in the reasonably foreseeable future. *Nguyen*, 788 F. Supp. 3d at 149. The Government suggests that Mr. Chan's declaration alone is "evidence" sufficient to prove that Mr. Hall's removal is "significantly likely to occur in the reasonably foreseeable future." ECF No. 8 at 2.

The Court disagrees. First, the Government has not produced the alleged travel document or provided any verifiable proof that such a document exists, "such as a document number, validity period, expiration date, or scheduled removal date." ECF No. 9 at 4. Second, the Government has failed to respond to multiple requests made by Mr. Hall's attorneys to produce the alleged travel document. *Id.*; *see also* ECF No. 9-1 at 1 (showing unanswered email dated December 6, 2025 from Mr. Hall's counsel, requesting that ICE produce "removal information for Malcolm Eldridge Hall"). The Government claims it "is not obligated to produce [this] evidence," but this again goes against the clear weight of authority holding otherwise. *Nguyen*, 788 F. Supp. 3d at 149; *Escalante*, 2025 WL 2206113, at *3; *Yan-Ling X.*, 2025 WL 3123793, at *3; *Roble*, 2025 WL 2443453, at *4; *Abuelhawa*, 2025 WL 2937692, at *8.

There are issues with Mr. Chan's declaration as well. He states, for instance, that the Embassy of Liberia issued the travel document for Mr. Hall. ECF No. 8-1

at 4.  But this ignores the fact that just a few weeks prior, during the virtual interview, a representative from the Liberian government informed ICE officials that Mr. Hall's removal could not be processed without his identity documents.  ECF No. 1 at 4.  The Government has not shown what steps, if any, were taken to overcome this obstacle.  Nor has the Government produced these identity documents.  The Government has not even shown that any communication with Liberia has occurred since the virtual interview was held in November.  *Cf. Elshourbagy v. Bondi*, No. 2:25-cv-02432-TL, 2025 WL 3718993, at *6 (W.D. Wash. Dec. 23, 2025) (holding that the Government failed to show that Petitioner's removal to Uganda was significantly likely to occur due to lack of evidence in record that "steps [had] been taken to obtain a Ugandan travel document for Petitioner, that Uganda [had] any interest in accepting Petitioner, or even that there [had] been any communication with Uganda regarding Petitioner at all").

The Government also contends, based on Mr. Chan's assertions, that Mr. Hall's removal should be no trouble because it "has been removing aliens [to Liberia] throughout this year."  ECF No. 8 at 2 (citing ECF No. 8-1 at 3-4).  However, this claim does not aid the Government's position either.  If the total number of travel document requests and the total number of removals to Liberia were disclosed, the Court might be able to gauge how likely it is that Mr. Hall would be removed there.  *Cf. Nguyen*, 788 F. Supp. 3d at 151 (conducting same analysis, but for noncitizens from Vietnam); *Thai v. Hyde*, 788 F. Supp. 3d 57, 61 (D. Mass. 2025) (finding petitioner's removal foreseeable where the Government "previously removed at least

25 similarly situated" noncitizens to Cambodia).  For example, if DHS had requested 350 travel documents from Liberia and 300 individuals had been deported there, then the Government may very well have shown that removal is significantly likely to occur in the reasonably foreseeable future.  *Nguyen*, 788 F. Supp. 3d at 151.  If, on the other hand, DHS had submitted 3,500 travel document requests and only 300 individuals had been deported there, then the Government would fail to meet its burden.  *Id.*  Thus, in the absence of these statistics, this claim does not weigh in the Government's favor.

Therefore, on the record before the Court, the Government cannot make the showing necessary to prove that circumstances have changed such that there is a significant likelihood that Mr. Hall will be removed to Liberia in the reasonably foreseeable future pursuant to 8 C.F.R. § 241.13(i)(2).  *Nguyen*, 788 F. Supp. 3d at 152.

### C.  Remedy

Having concluded that the Government has failed to meet its evidentiary burden, the Court must now determine the appropriate remedy for Mr. Hall.  Taken together, ICE's decision to revoke Mr. Hall's supervised release and re-detain him is not in compliance with 8 C.F.R. § 241.13, and it violated his procedural due process rights.  *Perez-Escobar*, 792 F. Supp. 3d at 226 ("Noncitizens, even those subject to a final removal order, are entitled to due process.").  Of course, "ICE, like any agency 'has the duty to follow its own federal regulations.'"  *Rombot*, 296 F. Supp. 3d at 388 (quoting *Haoud v. Ashcroft*, 350 F.3d 201, 205 (1st Cir. 2003)).  As here, "where an

immigration 'regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute' ... 'and [ICE] fails to adhere to it, the challenged [action] is invalid.'" *Id.* (quoting *Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993)).

Given these regulatory and constitutional violations, the Court finds that Mr. Hall's immediate release is appropriate. *See Morrisey v. Brewer*, 408 U.S. 471, 481 (1972) ("It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands."). Mr. Hall's immediate release shall be subject to the conditions of his preexisting Order of Supervision. *See Nguyen*, 788 F. Supp. 3d at 153 (ordering similar relief); *Perez-Escobar*, 792 F. Supp. 3d at 226-27 (same).

## III.    CONCLUSION

Accordingly, for the reasons articulated above, the Court GRANTS Mr. Hall's habeas petition. ECF No. 1. The Government is hereby ORDERED to **release Malcolm Eldridge Hall immediately** under the conditions of his preexisting Order of Supervision.

IT IS SO ORDERED.

*s/John J. McConnell, Jr.*

_____
JOHN J. MCCONNELL, JR.
Chief Judge
United States District Court


January 2, 2026